[Cite as *State v. Long* , 2018-Ohio-3013.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2017-L-094** |
| ANTHONY T. LONG, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas.
Case No. 2016 CR 000571.

Judgment: Affirmed in part and reversed in part; remanded.

*Charles E. Coulson*, Lake County Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077; and *Stephanie G. Snevel*, Special Prosecutor, P.O. Box 572, Wickliffe, OH 44092 (For Plaintiff-Appellee).

*Charles R. Grieshammer*, Lake County Public Defender, and *Vanessa R. Clapp*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

TIMOTHY P. CANNON, J.

{¶1} Appellant, Anthony T. Long, appeals from the July 11, 2017 judgment entry of sentence of the Lake County Court of Common Pleas. The trial court's judgment is affirmed in part and reversed in part, and the matter is remanded.

{¶2} On November 18, 2016, appellant was indicted on two counts of Aggravated Burglary, first-degree felonies, in violation of R.C. 2911.11(A)(1) (Counts 1 & 3) and two

counts of Burglary, second-degree felonies, in violation of R.C. 2911.12(A)(1) (Counts 2 & 4). Appellant entered a plea of not guilty. Count 2 was dismissed prior to trial at the request of appellee, the state of Ohio. The charges were renumbered: Count 1, Aggravated Burglary; Count 2, Aggravated Burglary; and Count 3, Burglary.

{¶3} On May 23, 2017, the matter proceeded to a jury trial. The state presented testimony from the victims, Clara Thomas and her son, A.T., and from Erica Lansberry, Joseph Forman, Isaiah Haynes, and Patrolman William Sickles.

{¶4} Erica Lansberry testified that on March 6, 2016, she lived at the Brentwood Apartments with Joseph Forman and her four children. Clara Thomas was her neighbor. One of the bedrooms in Erica's apartment shared a wall with Clara's closet.

{¶5} At dusk on March 6, 2016, while she was outside smoking a cigarette in front of her apartment building, Erica saw four people, three males and one younger female, come around the corner. Erica testified they seemed upset. She saw the three males enter the building; the female remained outside. Erica described the three males entering the building as follows: (1) "tall, thin, white and very tall actually"; (2) "light-colored skin, African American * * * a couple inches taller than the first boy"; and (3) "African American, darker skin, shorter in stature than the other two and he had on a black and red jacket." Erica explained that at the time she did not know the identities of any of the people she described; however, she learned them later.

{¶6} In court, Erica identified appellant as one of the people she saw on that evening.

{¶7} Erica testified that after the three males entered the building, they went to the downstairs apartment where Erica's old neighbor and friend, Alisha, lived. They

2

spoke with Alisha's son, Isaiah. Erica could not hear the conversation they had with Isaiah, but she saw Isaiah go upstairs with them. Erica observed that while the others appeared to go up the stairs in a hurry, Isaiah lagged behind.

{¶8} Erica testified that she saw the group stand in the hallway at the top of the stairwell outside the closed door of Clara's apartment unit. Isaiah stood back from the rest of the group and was doing something on his phone; he looked distracted from what was going on in front of him. Erica saw an arm reach out and knock on the door of Clara's unit. She thought it was Isaiah that knocked on the door, but she could not be positive.

{¶9} Erica explained that she looked away for a "split second" but turned back to look at the top of the stairs because she was always afraid her children may come out of her apartment. She saw the "skinny white guy" kick in the door. She heard a loud bang and saw the three males enter the apartment. Erica testified that Isaiah remained behind, looked shocked when the door was kicked open, and went back downstairs to his apartment. Erica was still standing outside but heard what she described as "a lot of yelling other noises besides yelling" going on within the apartment.

{¶10} Erica testified that she saw Joseph exit their apartment and go into Clara's unit. She did not want to get involved and waited a minute to see if everyone was okay. After Joseph entered the unit, Erica saw "the tall thin white boy" and "the other taller boy" run out of the apartment and down the stairs. Erica identified the boys as "Andrew and a boy named [K.L.]." She saw them knock on the door of Isaiah's apartment. She testified that by this time, she had the door to the building open and was trying to figure out what was happening. She heard Andrew and K.L. talking to Isaiah. Andrew and K.L. then exited the building and went around the corner to where the younger female was standing.

3

{¶11} Erica went upstairs to check on Joseph and Clara. She testified that the door to Clara's unit was open and she saw Joseph walk through the apartment, exit, and go back into their apartment. She remained in the living room of Clara's apartment. She saw Clara's son holding the side of his head and pacing back and forth, in and out of his bedroom. When she asked if he was okay, his reply was unintelligible.

{¶12} Erica explained that the apartment looked in disarray. She saw Clara "peeking" her head out of what appeared to Erica as a closet or bathroom in Clara's bedroom. Clara appeared "shaken up." Erica saw appellant with Clara and asked Clara three times whether she was okay. Clara indicated she was. She did not observe any injury to Clara. Erica did not speak with appellant.

{¶13} Erica did not call the police on the night of the incident. She did, however, give a statement to the police on March 12, 2016.

{¶14} Joseph Forman testified that on March 6, 2016, he lived in the Brentwood Apartments with Erica and her children. They lived next door to Clara.

{¶15} On the night of the incident, Joseph was putting one of the children to bed, when he heard a loud thump against the wall. He alerted Erica something was going on next door. He walked out and saw the door of Clara's apartment had been damaged. When he walked into the apartment, he saw a young African American male, approximately 15 years old, in the hallway. There was a Caucasian male, who looked a little older, in front of the bedroom. Joseph testified that as the two males walked out of the apartment, the Caucasian male walked up to him, got in his face, and made racial remarks. Joseph told the male he did not want any problems and to get out. Joseph walked towards voices he heard at the back of the apartment. A.T., who was sitting on

4

the bed in his bedroom, looked distraught. After Joseph asked whether he was okay, A.T. indicated he was fine.

{¶16} Joseph testified that when he walked into the back bedroom, he saw an African American male standing in the bedroom. He had never seen the man before and knew he did not live in the building. Clara was in the closet. The closet was torn up, and Joseph testified he could tell something had happened. Clara looked shaken, was crying, and could barely speak; her shirt was not on, and she was attempting to cover herself with something she was holding. When Joseph first asked Clara whether she was okay, she did not respond and looked in the direction of the man. Joseph was concerned about the reason the man was in Clara's room, so Joseph asked him whether he was supposed to be there and told him he should leave. The second time Joseph asked whether Clara was okay, he could hear the trembling in her voice as she responded she was fine. He asked the man to leave again. The man responded he belonged there and was trying to deal with the situation. At that time, Clara "said something" to Joseph, and Joseph left the apartment.

{¶17} In court, Joseph identified appellant as the man he had seen in the bedroom in Clara's apartment.

{¶18} On cross-examination, Joseph testified there was a younger female in the apartment building at the bottom of the stairwell. He did not know who she was, but he felt things calmed down after she and the two younger males had exited the building. Joseph returned to his apartment, then went out to have a smoke and observe what was happening. He spoke with Clara later that evening.

**{¶19}** Joseph testified that he did not call the police because he feared retaliation, and he did not recall seeing any police at the apartment that night. He explained that in that area there were problems with violent crime. The police contacted him the following day, and he provided a statement.

**{¶20}** Isaiah Haynes testified that he is 19 years old, and that on March 6, 2016, he was living in the Brentwood Apartments with his mother, brother, and sisters. That evening, while he was on the phone with his girlfriend, he heard a knock at the door. He was not expecting visitors. At the door were appellant, K.L., and T.L. Isaiah testified that appellant raised him and is his cousin, although not a blood relation; K.L. is a blood-related cousin; and T.L. is also a cousin. Isaiah testified that Andrew Clelland also showed up at his apartment at some point, but he did not arrive there at the same time as appellant, K.L., and T.L.; Isaiah and Andrew "grew up like brothers."

**{¶21}** Isaiah explained that they engaged in "family talk," but the conversation got right to the point, and appellant asked Isaiah if he knew A.T. and where A.T. lived. After informing them A.T. lived upstairs, Isaiah led the group to A.T.'s apartment where A.T. lived with his mother, Clara Thomas. Isaiah knocked on the door, and when A.T. asked who was there, Isaiah identified himself. Isaiah testified that when A.T. opened the door, K.L. "peeked around," looked at A.T., and punched him in the face. A.T. said something along the lines of "'That's why we got your sister.'" The group then looked at each other, entered the apartment, and a fight broke out between A.T., K.L., and Andrew. Clara came running out of her room and into the hallway of the apartment. She was yelling at them to stop fighting and that she was pregnant. At that point, appellant ran into the apartment and put his body between Clara's body and the fight. A.T. got away from Andrew and

6

K.L. and ran into his mother's walk-in closet. Everyone else followed him into the closet where Clara stood on the left side. Isaiah testified he saw Andrew hit A.T. After the fight, A.T. was on the floor curled up in a ball, and Isaiah heard Andrew screaming and yelling at the neighbors.

{¶22} Isaiah explained that while he was at the door of A.T. and Clara's apartment, he was talking to his girlfriend on speaker phone. He was not looking at the door. Isaiah did not see Andrew kick in the apartment door, and he did not hear the door get kicked. While they were in the apartment, Isaiah saw K.L. and Andrew hitting A.T., but he did not see Clara get hit or pushed against the wall of the closet. Clara was wearing a red robe with a design on it, and she was yelling and crying and appeared "livid" about the incident. Isaiah did not observe any injury to Clara but knew his mother took Clara to the hospital after the incident.

{¶23} Isaiah further testified he had no knowledge that K.L. or appellant wanted to fight A.T. but stated he assumed K.L. would want to fight A.T. due to something that happened to K.L.'s sister. Isaiah testified he knew something had happened with K.L.'s sister at least a week or two prior to the fight with A.T., but he "was just told not to say anything."

{¶24} Isaiah talked to the police the next day and provided a written statement about the incident. Isaiah was not arrested or charged.

{¶25} A.T. testified he is 16 years old. On March 6, 2016, he was 14 years old and lived in the Brentwood Apartments with his mother, Clara Thomas. After going to church and his grandmother's house, he and his mother returned to Brentwood in the evening. He heard a knock at the door and went to answer it. Isaiah, his downstairs

7

neighbor, was at the door with some other people. One of the people was Caucasian with a beard and a mustache. A.T. knew his name was "Drew." A.T. testified there was also a young female, a male teen, and an adult male at the door. In court, A.T. identified appellant as the adult.

{¶26} When A.T. answered the door the teen punched him, A.T. fell to the floor, and the teen and the Caucasian male punched and kicked him. A.T. testified he then ran back to his mother's room. His mother was lying in bed. A.T. ended up on the closet floor where they punched and kicked him again. He explained that his mother tried to get them off him, and the adult pushed her into the wall on the left side of the closet. Isaiah, the teen, and the Caucasian male scattered and left the building. A.T. saw his mother having a conversation with appellant after the incident. His mother was crying and appeared shocked and scared.

{¶27} A.T. stated that after the incident, his mother told him there was something wrong with her stomach and that she had to go to the hospital. Nobody called the police that night, but A.T. talked to the police the next day and provided a written statement.

{¶28} On cross-examination, A.T. testified that when he was in the closet being kicked and punched, he tried to cover his face with his hands. After the fighting, he went back to his room to turn off his game while appellant was talking to his mother. When he returned to his mother's room, appellant was sitting on his mother's bed talking to her.

{¶29} Clara Thomas testified that on March 6, 2016, she lived in the Brentwood Apartments with her son, A.T. After she and A.T. got home from church, she was in her bedroom, and A.T. was in his room playing games. She was not feeling well and was lying in her bed. Clara heard a knock at the door and yelled for A.T. to answer it. She

8

heard something going on in the living room but did not know what was happening until her son ran into her room. She got up and saw there were people in her home. At the time, she did not know their names but later learned their identities. She testified she saw Andrew Clelland and K.L. running after her son and into the closet. Clara followed them into the closet and was pushing them off her son. She testified appellant pushed her against the wall of the closet. Clara testified that after being pushed, she said, "'What's going on? I'm pregnant. I'm his mother.'" Appellant let her go and apologized, stating, "'Oh, I'm sorry. I thought you were his sister. I didn't know you were his mother.'"

{¶30} Clara testified Andrew is tall and slim and K.L. is short. She saw Andrew and K.L. hit her son. She did not see anyone else hit her son.

{¶31} In court, Clara identified appellant as the person who pushed her in the closet.

{¶32} Clara explained that after the incident she was sore, and she had some bleeding. Alisha Haynes took her to the hospital that evening. Clara testified the bleeding resolved itself. She stated that A.T. had a "knot" on his forehead and on the back of his head.

{¶33} The next day, Clara went to the police department with her son and her mother. She notified the police of the incident. She spoke with Officer Sickles and completed a written statement.

{¶34} Clara testified that after the incident she did not feel safe in her home. She and her son moved in April 2016 because she started a new job and because she was not comfortable living in the apartment.

**{¶35}** On cross-examination, Clara testified that on the night of the incident, she was in her first trimester of pregnancy and was not feeling well due to a stomachache from something she had eaten. She stated that two of her neighbors, Joseph and Erica, checked on her after the incident. Clara indicated that after the younger males left the apartment, appellant stayed and spoke with her.

**{¶36}** Patrolman William Sickles testified he works for the Painesville Police Department. He explained he is familiar with the Brentwood Apartments because he has had to respond there for various crimes.

**{¶37}** On March 7, 2016, Clara Thomas and A.T. came to the police station, and Officer Sickles spoke with them. They told him about the events of March 6, 2016. They had done some research and were able to identify the individuals who had been in their home. Officer Sickles collected written statements from Clara and A.T., and Clara filled out a medical release form. He did not observe injuries to either Clara or A.T. at the time of the interview.

**{¶38}** Officer Sickles identified Andrew Clelland, K.L., and appellant as suspects. He determined the ages of those individuals to be 18 years old, 16 years old, and 38 years old, respectively.

**{¶39}** Officer Sickles testified that later in the evening of March 7, 2016, Clara called the police station to report Andrew Clelland was outside of her apartment building. Officer Sickles testified Clara was scared and frantic. Officer Sickles and another officer responded to the call but were unable to locate Andrew. After checking for Andrew, he spoke with Clara, and she was "very frantic and scared." While he spoke with her, she looked out her front window, saw Isaiah Haynes, and pointed him out, indicating police

10

should speak with him because he was at her apartment during the incident on the previous evening.

**{¶40}** Officer Sickles spoke with Isaiah, who provided a written statement and a video interview. Officer Sickles explained Isaiah was not charged. Officer Sickles testified he was aware Isaiah had entered the apartment but found that "he was more of an unsuspecting witness."

**{¶41}** With the statements from Clara, A.T., and Isaiah, Officer Sickles was able to come to a determination of the charges for Andrew, K.L., and appellant.

**{¶42}** Officer Sickles conducted a further investigation into the incident and interviewed other witnesses. Later in the week, Erica Lansberry contacted police to report she had witnessed something that occurred at her apartment. Officer Sickles interviewed Erica, and she gave a written statement. Erica also advised that her boyfriend, Joseph Forman, had intervened in the incident. Officer Sickles called Joseph, who came and gave a written statement. During the course of the investigation, Officer Sickles took photos of the residence and spoke with Clara about the damage to her residence.

**{¶43}** The jury found appellant guilty on all counts. Appellant was sentenced on July 3, 2017. Upon a joint recommendation from the parties, the trial court merged the Burglary count with the Aggravated Burglary counts. The trial court did not specify with which of the Aggravated Burglary counts it should merge, and there is no indication the state made any election. Defendant requested the court also merge the two counts of Aggravated Burglary, but the trial court determined they were not subject to merger. The trial court imposed a 5-year prison sentence on each count of Aggravated Burglary, to be

11

served concurrently with each other, with 46 days of credit for time served. Appellant was also ordered to pay costs. The trial court filed its sentencing entry on July 11, 2017.

{¶44} Appellant noticed a timely appeal and asserts three assignments of error.

{¶45} Appellant's first assignment of error states:

> The trial court erred when it limited defense counsel's cross examination of two key witnesses in violation of the defendant-appellant's rights to due process and fair trial and to confront witnesses as guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶46} Prior to trial, the state filed a motion in limine, requesting the court limit appellant from questioning any witness at trial about the details surrounding an alleged sexual assault occurring between A.T. and appellant's daughter. The state argued the nature of the charge and the specific details related to the uncharged criminal conduct would be highly prejudicial. Appellant filed a brief in opposition, arguing evidence of the alleged sexual assault was pertinent to his defense. Appellant maintained it was necessary to establish why he interacted with Clara. He also argued the sexual assault allegations could demonstrate bias on behalf of Clara and A.T.

{¶47} The trial court granted the motion in part and denied it in part, stating:

> * * * I did prohibit the [appellant] from cross-examining [A.T.], regarding this matter. The purpose of presenting this evidence, and the [appellant] filed an opposition setting forth what his position was, that he believes he had a right to delve into or present evidence into why [appellant] may have engaged in certain conduct that he did that night or what his motive was or his intent was that night. And purportedly it's based on trying to look further into this incident that allegedly occurred between * * * his daughter and A.T. Appellant felt he had a right to delve into that to try and explain what [he] was doing that night and I agree with him in that regards.
>
> So I was not prohibiting him from inquiring into witnesses who have perhaps the knowledge as to why [appellant] did what he did that

12

night. Certainly, would permit [appellant] to testify in this matter, to explain why he did whatever he did that evening, engaged in whatever conduct he did that night and if it includes wanting to look into these allegations, then he was going to be permitted to do that. And if * * * anyone else had [knowledge] in regards to that, I was going to let them inquire into that.

What the concern, question as to obviously the hearsay issues in regards to people had knowledge of this case solely on [appellant] telling them and that was going to be impermissible hearsay and I wasn't going to allow that. But I will allow evidence of that to come out if it pertains to [appellant's] knowledge.

I did rule that cross-examining [A.T.] concerning the incident and whether it happened or didn't happen or any other details about that was completely irrelevant to this particular case.

{¶48} Appellant argues the trial court denied him the opportunity to establish Clara and A.T. may have had a motive to lie, in violation of his Sixth Amendment right to confront witnesses.

{¶49} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" *See also* Ohio Constitution, Article I, Section 10 ("the party accused shall be allowed * * * to meet the witnesses face to face"). "However, the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶83, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). "Trial courts have 'wide latitude * * * to impose reasonable limits on such cross-examination[.]'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶170, quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

{¶50} Under Ohio law, "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B). "Bias * * * or any motive to

13

misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence." Evid.R. 616(A). However, Evid.R. 611(A) provides, in pertinent part, that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence[.]"

{¶51} On appeal, when an appellant challenges a trial court's limitation on cross-examination, the standard of review is determined by the nature of the limitation. *McKelton*, *supra*, at ¶172. "'Limitations * * * that deny a defendant "the opportunity to *establish* that the witnesses may have had a motive to lie' infringe on core Sixth Amendment rights' and are reviewed de novo." *Id.*, quoting *State v. Gonzales*, 151 Ohio App.3d 160, 2002-Ohio-4937, ¶45 (1st Dist.), quoting *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir.1994) (emphasis sic). To establish a confrontation violation, appellant must show he was "'prohibited from engaging in otherwise appropriate cross-examination.'" *Id.*, quoting *Van Arsdall*, *supra*, at 680. If a trial court, however, allowed cross-examination to establish a motive to lie but limited the extent to which defense counsel could question witnesses regarding the motive, we review for an abuse of discretion because "'it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury.'" *Id.*, quoting *Nelson*, *supra*, at 708.

{¶52} Appellant maintains "the trial court partially granted the State's Motion-in-Limine to restrict the defense in its cross examination of A.T. and his mother regarding allegations that A.T. had sexually assaulted Mr. Long's daughter." A review of the record reveals, however, that the trial court limited cross-examination of A.T. concerning details about the alleged sexual assault and whether it happened, finding that evidence was

14

irrelevant.  Appellant was not denied the *opportunity* to establish Clara and A.T.'s motive to lie; rather, the trial court limited the scope and extent to which appellant could cross-examine A.T. about that motive.  Further, the trial court allowed the defense to question witnesses about the allegations to the extent it established appellant's intent on the evening of the incident.  Accordingly, we review the trial court's limitation on the cross-examination of A.T. for an abuse of discretion.  An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'"  *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting *Black's Law Dictionary* 11 (8th Ed.2004).

{¶53}  Under Evid.R. 402:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio.  Evidence which is not relevant is not admissible.

Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

{¶54}  Although evidence appellant's daughter made criminal allegations against A.T. is relevant to establish a motive for A.T. and his mother to misrepresent the facts, specific details about those allegations are irrelevant.  We do not find the trial court abused its discretion in limiting the cross-examination of A.T.

{¶55}  On the record, defense counsel indicated he would have questioned the witnesses about the alleged sexual assault to establish bias, but he did not make a proffer of the questions he wanted to ask.  Because there was no proffer, the trial court made no

15

ruling on whether the potential questions were admissible, and the issue was not preserved for review on appeal. *See State v. Archibald*, 11th Dist. Lake Nos. 2006-L-047 & 2006-L-207, 2007-Ohio-4966, ¶43-44. Without a proffer of a specific question and a ruling from the trial court, we would have to speculate as to what question defense counsel wanted to ask and whether the trial court would have sustained or overruled the objection. We will not engage in that speculation.

**{¶56}** Appellant's first assignment of error is without merit.

**{¶57}** Appellant's second assignment of error states:

**{¶58}** "The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

**{¶59}** Appellant argues the jury verdict was against the manifest weight of the evidence because the evidence presented was "incredible, vague, contradictory, conflicting, unreliable, fragmentary, self-serving, and uncertain."

**{¶60}** To determine whether a verdict is against the manifest weight of the evidence, a reviewing court must consider the weight of the evidence, including the credibility of the witnesses and all reasonable inferences, to determine whether the trier of fact "'lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "This court [is] not in a position to view the witnesses who testified below and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the proffered testimony." *State v. Long*, 127 Ohio App.3d 328, 335 (4th Dist.1998) (citations omitted). Therefore, in weighing the evidence submitted at a criminal trial, an

16

appellate court must give substantial deference to the factfinder's determinations of credibility. *State v. Tribble*, 2d Dist. Montgomery No. 24231, 2011-Ohio-3618, ¶30, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

{¶61} Appellant was convicted of two counts of Aggravated Burglary and one count of Burglary. The state was required to prove, beyond a reasonable doubt, appellant violated the following statutes:

> **R.C. 2911.11 Aggravated Burglary**
> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another[.]
>
> **R.C. 2911.12 Burglary**
> (A) No person, by force, stealth, or deception, shall do any of the following:
>
> (1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense[.]"

The jury was also instructed on the definitions of Assault, Menacing, and Complicity or Aiding and Abetting.

{¶62} Although the witnesses provided inconsistent testimony, the jury was in the best position to view the witnesses and evaluate their credibility. Further, even in light of the contradictory evidence, there was sufficient evidence pursuant to which the jury could have found appellant guilty under a theory of Complicity. Upon review of the evidence

17

outlined above, we find the jury did not lose its way or create a manifest miscarriage of justice by finding appellant guilty of Burglary and Aggravated Burglary.

**{¶63}** Appellant's second assignment of error is without merit.

**{¶64}** Appellant's third assignment of error states:

> The trial court erred to the prejudice of the defendant-appellant when it failed to merge his convictions for aggravated burglary, in violation of his rights against double jeopardy under the Fifth and Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

**{¶65}** Appellant maintains the trial court should have merged appellant's two Aggravated Burglary counts. In response, appellee contends the two offenses cannot merge because each count involved a separate victim.

**{¶66}** R.C. 2941.25 "incorporates the constitutional protections against double jeopardy. These protections generally forbid successive prosecutions and multiple punishments for the same offense." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶7. "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). "Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." R.C. 2941.25(B).

**{¶67}** "The determination whether an offender has been found guilty of allied offenses of similar import 'is dependent upon the facts of a case because R.C. 2941.25

18

focuses on the defendant's conduct,' and 'an offense may be committed in a variety of ways.'" *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, ¶18, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶26 & ¶30.

**{¶68}** "When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import[.]" *Ruff*, *supra*, at ¶24, citing R.C. 2941.25(B). "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses:

> (1) Were the offenses dissimilar in import or significance?
> (2) Were they committed separately? and
> (3) Were they committed with separate animus or motivation?

*Ruff*, *supra*, at ¶31; *see also id.* at ¶13, citing *State v. Moss*, 69 Ohio St.2d 515, 519 (1982). "An affirmative answer to any of the above will permit separate convictions." *Id.* at ¶31.

**{¶69}** Prior to *Ruff*, courts have held that when an offender "enters a residence and threatens, attempts, or inflicts physical harm on more than one occupant during the burglary, the aggravated-burglary offenses merge." *State v. Marriott*, 2d Dist. Clark No. 2008 CA 48, 2010-Ohio-3115, ¶46; *see also State v. Lynott*, 8th Dist. Cuyahoga No. 89079, 2007-Ohio-5849, ¶29. The Aggravated Burglary statute is meant to enhance the seriousness of a trespass under circumstances where the offender raises the risk of harm to occupants of a structure. *See id.* ("R.C. 2911.11(A) is not meant to criminalize an

offender's conduct toward the occupants of the structure; rather, the prosecutor may charge the defendant with an assault offense to satisfy that interest.").

**{¶70}** In *State v. Burton*, a post-*Ruff* decision, the appellant was convicted of four counts of Aggravated Burglary because four victims were harmed during a home invasion. 7th Dist. Jefferson No. 13 JE 39, 2015-Ohio-2247. The appellate court determined the Aggravated Burglary counts should merge, stating:

> While on first blush it might appear, in light of the separate victims, that the aggravated burglary offenses herein are of dissimilar in import or significance—in other words, that each offense caused separate, identifiable harm—under the [rationale] of *Marriott, Lynott* and *Adkins* those victims are what elevated the offense from a simple burglary to the more severe "aggravated" form of the offense. At the heart of an aggravated burglary is the trespass. And there was only one identifiable trespass into the home here.

*Id.* at ¶63.

**{¶71}** In support of its argument the two counts of Aggravated Burglary should not merge, appellee directs our attention to this court's decision in *State v. Jameson*, in which we stated, "counts five through fourteen *cannot* merge because they represent offenses against separate victims who suffered separate, individual harm as a result of the offenses to which appellant pleaded." 11th Dist. Ashtabula No. 2014-A-0069, 2015-Ohio-4634, ¶18 (emphasis sic). That case, however, is inapplicable here because it pertained to multiple counts of Felonious Assault, rather than multiple counts of Aggravated Burglary. Appellee has cited to no case where multiple victims in the same structure support multiple counts of a single incident of Aggravated Burglary.

**{¶72}** Here, although the indictment lists separate victims for each of appellant's two counts of Aggravated Burglary, both counts stemmed from the same trespass. Therefore, the two counts of Aggravated Burglary are allied offenses of similar import that

20

must merge. The trial court erred in failing to merge those counts, and a remand is required for the counts to merge, with the state electing on which charge to proceed. *See Whitfield*, *supra*, at ¶25("If, upon appeal, a court of appeals finds reversible error in the imposition of multiple punishments for allied offenses, the court must reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant.").

{¶73} Appellant's third assignment of error has merit.

{¶74} The judgment of the Lake County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded for a limited resentencing.


COLLEEN MARY O'TOOLE, J., concurs,

DIANE V. GRENDELL, J., concurs in judgment only.